LOTTINGER, Judge.
This is an expropriation suit and the plaintiff has appealed from a judgment of the Lower Court. The defendant has neither appealed nor filed an answer. The trial judge in his written reasons for judgment has so adequately resolved the issues presented in this matter that we adopt the pertinent part of his opinion as our own. It is as follows:
“This is a suit to expropriate Lot Eight (8) and the East eight (8) feet of Lot Six (6) of Square Two Hundred Ninety-five (295) of Lake Park Subdivision, measuring 58 feet front on the North side of Boyd Avenue by a depth and front on the west of Lake Park Drive of 110 feet between equal and parallel lines (also designated as No. 915 Boyd Avenue), and improvements, located in the City of Baton Rouge. Plaintiff alleges that in order to construct State Project No. 817-34-05 and Federal Aid Urban No. U-414, the expropriation of the above described property is necessary, and that it is being taken under the authority of Section 19.1 of Article VI of the Constitution of Louisiana and Sections 441 through 460 of Title 48 of the Louisiana Revised Statutes of 1950. Plaintiff alleges that the just compensation to which the defendant is entitled has been estimated at the sum of $16,800.00, and prays that upon a final hearing herein there be judgment in favor of plaintiff fixing the amount of just compensation due at a sum not to exceed $16,800.00.
“Defendant, by answer timely filed, is claiming the sum of Twenty-three Thousand Five Hundred and No/100 ($23,500.00) Dollars, as just compensation for the subject property. Defendant, by supplemental and amended answer, prays for judgment in the additional sum of One Thousand and No/100 Dollars for the payment of expert appraisers.
“Reversing the usual order of things, the defendant in suit placed her witnesses on the stand first. Mr. William Warren Mun-son was the first expert who testified for the defendant. He is an experienced real estate appraiser, being a member of American Institute of Real Estate Appraisers, and also experienced in real estate rentals and in the construction of homes. He expressed the thought that he had something to add to the record which would be of benefit to the court, because of his intimate familiarity with the subject property and his knowledge of the kind of people who would buy property in the area. This witness classified the immediate vicinity of the defendant’s home, which is in the old University Lake (now Capitol Lake) “U” of “Loop”, as a prestigeous location which added value because of its attractiveness as a place to live (See T page 38). He said that in his opinion, homes in this area, this loop around the lake known as Lake Park, definitely are more valuable than the other homes in the general neighborhood, outside of the loop.
“Mr. Munson fixed the value of the subject property on August 9, 1957, the date of the expropriation, at the sum of $22,000.00. In doing this, he used the three methods of appraising that are generally accepted. In using the comparable approach, he found it necessary to go outside of the general neighborhood to get comparables. This was so, he explained, because of the many rumors prevalent in the area since the general *104 'rumor of the expressway arose. This situation in his opinion, precluded the existence of a free market in the area. In seeking comparables, he searched for neighborhoods of comparable value and importance. In this connection, he checked the Roseland Terrace area, University Gardens area, the Drehr section and the Kleinert area.
“His first comparable was located at 1938 Ferndale Street in University Gardens D-3. This location, in his opinion, was not quite as good as that of the subject property. There were no curbs and gutters on the streets. The house is much plainer and the materials are not as good, but it is a larger house. It is an old-style house. This sale was made on January 5, 1958, a time when prices were not as good as they were on August 9, 1957 (the date of the taking), Mr. Munson stated. The sale price was $30,000.00. This property, house and lot, was less valuable than the subject property, in his opinion.
“Mr. Munson’s second comparable was located at 800 Drehr Avenue (D^t). This house and lot, the latter measuring 80 x 120 feet, sold for $25,500.00 about three years prior to May 28, 1958. The house, the witness explained, was in a very poor state of repair. The house is about the same size as the house on the subject property, but the lot is larger. It was the opinion of Mr. Munson that this property would have sold for $27,500.00 if the owner had expended the sum of $500.00 for repairs prior to its sale. This comparable is located in zone A-l, whereas the subject property is situated in zone C. The latter, Mr. Munson stated, has much more value per front foot.
“Mr. Munson compared this comparable (D-4) with the property located at the southeast corner of Delphine and Spain Streets (D-5) to point up the importance of the neighborhood. The property (D-5) sold for $16,500.00. The house is larger and a little older than the house located at 800 Drehr Avenue (D-4) and the lot has a front of 80 feet. Mr. Munson said the property (D-5) would have brought $27,500.00, if it was located where (D-4) is situated. The difference is due, he explained, to the acceptability of the neighborhood. It was his judgment that the subject property’s location is an acceptable neighborhood and one that added bonus to its value.
“The next comparable taken into account by Mr. Munson was the sale of the property located at the corner of Tulip Street and Park Boulevard (D-6). This sale took place in October, 1954 and the price was $18,500.00. The lot measured 42 x 120 feet and is a corner lot. Mr. Munson stated that this lot is worth about $3,000.00 less than the lot of the subject property.
“The location of the next comparable was 1701 Cedardale Street in University Gardens (D-7). This house sold for $21,500.00 about two years prior to the date of the trial of this lawsuit. The house is an old style brick house, which had some rooms added to it, the work being poorly done. It is located on a blacktop street of very poor quality, without curbs and gutters. The neighborhood is good, Mr. Munson stated, but not as good as that of the subject property. In fact, he stated, Lake Park, where the subject property is situated, is far superior.
“Mr. Munson discussed a house and lot located at 630 Lakeland Street (D-8) and stated that the owner thereof wanted $22,-500.00 for it. A prospective purchaser was willing to pay $21,000.00 for it, but the owner insisted upon $22,500.00. There was no sale. This property is located in the immediate area of the subject property. He described the neighborhood as fair, but the house was in need of repair. In his opinion if this house would sell for $21,000.00, the value of $22,000.00 which he placed on the subject property, would certainly be, a fair price.
“In answer to a question, Mr. Munson stated that he was an experienced house builder and that he has been building houses since 1946 and 1947. (Tr. 53). He estimated the reproduction cost of the house (subject property) including the porches, *105 the garage, the walks and drives at $27,-529.00. From this figure he subtracted a total depreciation of forty per cent or $11,-011.00, which subtracted from the reproduction cost gave him a value of $16,518.00. Mr. Munson after considering other com-parables, said he gave the subject property a value of $133.00 per front foot and added $500.00 for corner influence, making a total of $8100.00 for the lot, and $750.00 for the shrubbery. This gave him a total replacement cost of $25,168.00 (Tr. 58). After stating that it is very difficult to estimate depreciation, he said he had taken the lesser figure of $22,000.00 as his estimate of the market value of the subject property.
“Mr. Munson testified he considered the economic method of appraisal, but stated that since the property was residential, and to his knowledge had never been rented, it was difficult to arrive at market value by this method. By using a general figure this method would give him a value of over $21,-000.00, because he felt that the property would rent for $150.00 per month (Tr. 59).
“Mr. Haywood Moore was the other expert called upon to testify for the defendant. He fixed the market value of the subject property at the sum of $22,000.00 as of August 9, 1957, the date of the taking. In arriving at this valuation he used comparable sales. His first comparable was a lot with a two-story house situated thereon at No. 2125 Government Street. The lot measured 50 x 120 feet and is located in zone “C” multiple, the same as the subject property. This house, he testified, was approximately thirty years old, and consisted of four bedrooms and two and a half baths, and it contained approximately the same amount of square footage as the subject property. This property, the witness stated, sold for $21,000.00 on April 20, 1956. In comparing this property with the subject property he pointed out that this was an inside lot, whereas the subject property is a corner, and this lot measured 50 feet in width, as compared to 58 feet for the subject property.
“The witness used the house and lot located at the corner of Tulip Street and Park Boulevard (D-6) as a comparable (Mr. Munson also used this comparable). This is a corner lot measuring 42 x 120 feet. The house has three bedrooms and two baths, one with a tub and one with a shower, a glassed-in porch, a living room and a separate dining room. It sold for $18,500.00 in October of 1954. In drawing a comparison between this comparable and the subject property, he said this house had less square feet in it and the lot is smaller than the one involved in this lawsuit. In addition, he stated that real estate prices have risen since 1954.
“He testified that he was very familiar with the comparable located on Delphine Street (D-5) which Munson used. In addition, he said he was in court when Mr. Warren Munson testified and he agreed with what he had to say about these two com-parables (D-5) and (D-6) as compared to the subject property insofar as he used them to support the value of $22,000.00 which he placed on the subject property.
“Mr. Moore testified that he did not use the replacement and income approaches to fix the value of the subject property, hut stated that the market value which he ascribed to the subject property was reasonable and in no way exaggerated. On cross-examination, he stated he examined a sale in the neighborhood of the subject property, the property being a three-bedroom house located on a 30 foot lot which sold for $15,750.00. He did not think this price was too low. In fact, he thought it was a good price for it.
“This expert testified that he agreed with the other expert, Mr. Warren Munson, that the neighborhood of the subject property was an exclusive one and had an added value because of that reason. Mr. Moore identified the photograph marked D-2 as being a picture of the subject property.
“The defendant testified that prior to 1941 her father had taken care of renovations to the subject property and that she *106 did not keep up with it. Her mother, she said, had considerable renovations made to the interior of the house in 1941 (See Tr. p. 115). She stated that she kept the house in pretty good condition since her mother’s death in 1943 until after the announcement of the expressway; after that, not quite so well.
“A full description of the house was given by the owner. (Tr. p. 4, 5, & 6.). She said it was a two-story house with a bedroom, bath, living room, dining room, kitchen and two pantries downstairs. Upstairs, there were three regular sized bedrooms, one small bedroom, which she used when she had company, a bath, a large storage closet, in addition to closets in each room, and a cedarlined closet off of the stairway. It had “a nice sized front porch and a small back porch”, she said. She explained that there was a deck upstairs over the front porch and that the front bedroom had low windows that opened out on this deck. The house, she testified had a tall roof and a very high attic and that an attic fan, because of this construction, cooled the house very satisfactorily.
“The plaintiff called Mr. Lowell M. Rose-man, a realtor, as an expert to testify as to the value of the subject property. Mr. Roseman stated that in appraising property he used the three accepted approaches, namely, the market data approach, the replacement less depreciation approach, and the income approach. He stated that the latter approach is merely a check when you have the other two, and that it is too risky to appraise the property strictly from the income approach. Mr. Roseman fixed the fair market value of the subject property on the date of the taking, August 9, 1957, at $16,500.00. (Tr. 127).
“Mr. Roseman gave a detailed description of the house and stated that it contained 1120 square feet downstairs and 1120 square feet upstairs and 189 square feet in porches. (Tr. 127 & 128). He said, in his opinion, the effective age of the house is forty years. By using $9.50 a square foot on the first floor and $4.75 a square foot on the second floor, he arrived at a replacement cost, including porches, of $16,432.00. Believing that the house had forty per cent remaining life, he depreciated the house sixty per cent, which gave him a depreciated value in round figures of $9860.00. To this sum, he added the garage at $1.00 a square foot,' making a total of $10,148.00. He valued the lot at $6400.00. Adding the two latter figures he arrived at a sum of $16,548.00, which he rounded at $16,550.00.
“In fixing the value of the land of the subject property this expert used a base of $100.00 a front foot and added ten per cent corner influence. This gave him a total amount for the lot of $6380.00, which he rounded out at $6400.00.
“Mr. Roseman said he attempted to use the income approach, but discarded it, as he felt it would not do justice to the property. As for market data, he studied sales of ‘two story houses wherever I could find them.’
“The first comparable he used was the Jimmie Major (or Denny) property located at 853 Convention Street, which sold on December 14, 1955, for $21,500.00. He testified that this lot was slightly wider but slightly less in depth and considerably closer to town than the subject property. On this lot was a large two-story house, he explained. (See P-12). He said he used the Major property as a comparable because, ‘The lots are quite similar, the zoning was the same, it is a two-story house.’ Adjustments had to be made for the extremely large size of the house. It sold for $21,-500.00, including furniture on the lower floor. (T. 160). He admitted that this was a big old rooming house that takes in roomers by the day, week and month, and that it was not a private residence in any sense of the word. This expert said, according to information received by him, that the lady who operated this rooming house earned $650.00 a month from this enterprise. Mr. Roseman admitted on cross-examination that he refrained from using the Hatch- *107 er property located on a corner about a hundred or two feet from the Major property. The Hatcher property was purchased by Mr. Hatcher for $30,000.00, the witness admitted. He said the lot measured 64 x 128 feet and that there was an old two story house thereon, which had been vacant for some time. This old house was demolished by the purchaser. The reason Mr. Roseman gave for not using this sale was that his investigation revealed it was not “a normal sale”. He explained that Mrs. Hatcher was anxious to move from the country and wanted this particular property and her husband purchased it for her from Mr. Tum-minello who was not anxious to sell the property but did sell it for the sum mentioned above. He ignored this sale on the tenuous theory that it was not a free and voluntary sale by and between the parties involved. (T. 166-168). Mr. Roseman admitted that the neighborhood where this property is located is nearly comparable to the neighborhood where the subject property was located, and that strictly from the standpoint of residential uses the location of the subject property had a slight appeal over the other. Yet, this expert fixed the value of the subject property at only $100.00 per front foot plus ten per cent comer influence. To the knowledge of the court Mr. Roseman had previously placed a valuation of $200.00 per front foot on property located in the area of the Major and Hatcher properties. (See No. 62,044 of this court, State of Louisiana, Through the Department of Highways vs. Frank J. Jones.) He fixed that value even though he did not use the Hatcher sale as a comparable, but did use the Major property as a comparable, as he did in the instant case.
“In order to arrive at the market value of the subject property, Mr. Roseman stated he used as a comparable the property located at 1003 Government Street, which sold on November 12, 1956 for $15,750.00. The neighborhood, the witness admitted is inferior to that of the subject property from a residential aspect. It is a mixed neighborhood of old houses, apartments, stores, a funeral home and filling stations. Government Street is a heavily traificed street. The neighborhood of this comparable offered ‘services’ which were not available in the area of the subject property, Mr. Rose-man said. - The house at 1003 Government Street was about the same age as the house on the subject property, he concluded.
“Another comparable used by Mr. Rose-man was (P-15) located at 4444 Claycut Road, now the home of Dr. Frank Jones. This comparable was purchased on February 11, 1957 for $30,000.00, a figure nearly twice the figure placed by this expert on the subject property. The house is about seventeen years old, is of fairly modern design and is located on a lot measuring 100 x 300 feet, he stated. He considered the neighborhood superior to that of the subject property, a position contradicted by defendant’s expert, Mr. Munson. Questioned by defendant’s counsel as to his reason for using this property (P15) as a comparable, Mr. Roseman replied: ‘That house was used mainly because it was two story, and we made adjustments.’ It is located many blocks away from the subject property.
“Mr. Roseman used as another comparable a house and lot located at 505 L.S.U. Avenue in College Town. This was a corner site measuring 150 x 165 feet and sold for $28,500.00 on March 16, 1956. The house, he explained, is considerably larger than the subject property, and had central heating. This property is located below Louisiana State University, and is several miles from Baton Rouge where the subject property is situated.
“Another comparable he used was located at 150 Stanford Avenue, also in College Town, which sold for $18,750.00 on February 18, 1957 (P-14), known as the old Guthrie home. Pie said he had information that this property was being offered for sale at the price of $30,000.00 after the owner had spent $8000.00 on repairs. Several weeks prior to the giving of his testimony in this case it still was unsold, he stated. He gave no further data about this com *108 parable, except he said he heard Mr. Mun-son, one of defendant’s experts, testify that there was something faulty about the foundation to this house.
“The other expert witness for the plaintiff was Mr. O. M. Thompson, whose qualifications as an expert appraiser were challenged by counsel for the defense, on the basis that he had made few, if any, appraisals other than for the Capital Building & Loan Association, in Baton Rouge, Louisiana, of which he is president, and that that restricted experience had trained him to place conservative values on the property appraised by him in order to insure the security of his Association, its shareholders and depositors. The court felt that this objection was leveled more at the effect of the witness’s testimony than its admissibility, and so ruled. Mr. Thompson admitted that ninety percent of his appraisal work was for his building and loan association and that there was a tendency on his part to make his appraisals ‘very slightly’ more conservative than the general market price.
“When questioned by plaintiff’s counsel as to what was the fair market value he placed on the subject property on August 9, 1957, the date of the expropriation, he answered that his appraisal was made on March 8, 1958, and that the value of $16,352.00 he gave to the property was of that date. He added, however, that he did not think there would be any difference in valuation between those two periods. Mr. Thompson testified the approaches he utilized in arriving at the fair market value of the subject property were the reproduction cost, less depreciation, and comparable sales. His reproduction cost was $17,003.00 for the improvements, not including the garage. Pie applied a percentage for depreciation and obsolescence of forty-five percent, and added what he considered to be a fair value of the garage, and arrived at a net value of $9352.00 for the improvements. His value on the lot was $6500.00, which was on the basis of $110.00 a front foot plus. The total valuation of the improvements and the land he fixed at the sum of $16,352.00, as noted above.
“The first comparable used by Mr. Thompson was the property purchased on October 8, 1957 by Fielding Phillips, et al., from Miss Clara Flower, located on Ninth Street, between Florida and Convention Streets. This property sold for $20,000.00, the land measuring 64 x 160 feet, the structure thereon being a two-story dwelling consisting of eight rooms. This property (the land only) he valued at $150.00 per front foot, or approximately $10,000.00 for the land. That amount, deducted from the sale price of $20,000.00, left the sum of $10,000.00 for the improvements. These improvements although valued by him at the sum of $10,-000.00 were not in quite as good condition as the house on the subject property, on which he placed a value of only $9,353.00. This comparable was not a corner lot like the subject property, but is six feet wider than the subject property.
“The next comparable used by this expert was located at 840 Convention Street, consisting of an inside lot measuring 64 x 128 feet, with' a one and one-half story frame dwelling thereon, which was purchased November 6, 1957, by Mrs. Fannie Bailey Rey-naud from Norwood, et als., for $21,000.00. He placed a value of $200.00 a front foot on this property, or approximately $12,800.00 for the land only. The improvements, he stated, were not in quite as good condition as the subject property. This comparable is located in Zone “C”, the same zone the subject property is located in. From a residential standpoint, the witness admitted that the neighborhood of the subject property was more attractive. This property, the witness admitted on cross-examination is about the same distance as the subject property from Third Street, Baton Rouge’s principal business street, but is not nearly as close as the subject property is to the State Capitol grounds, and is not as conveniently situated as the subject property is from the standpoint of convenience for state capítol and North Baton Rouge industrial employees who rent apartments.
*109 “Mr. Thompson did not use the sale from Tumminello to Hatcher (19S6) of a lot located on the corner of Convention and North Ninth Streets just next door to the first comparable he used. The Hatcher sale price of |30,000.00 was for the land alone, as the old two-story house located thereon was demolished by Mrs. Hatcher before she erected a new brick home on the property. The reason he ignored the Hatcher sale, Mr. Thompson explained, was the fact that he could not find any sale prior to the date of the sale of the Hatcher property or any sale since its date that reflected a price anywhere close to the price paid for the Hatch-er property.
“The third and last comparable used by Mr. Thompson was the property purchased by the First Presbyterian Church from the Maas Heirs on March 7, 1958, which was about seven months after the date of the taking of the subject property. This property measures 45 x 128 feet, plus a 9 foot servitude and the improvements thereon being a one-story frame house made into three apartments. It is located at 724 Convention Street. Mr. Thompson placed a value on this fractional inside lot at the sum of $8000.00, being on the basis of almost $200.00 per front foot. This comparable is located in the immediate vicinity of the first two comparables used by the witness.
“It is evident to me that land values fixed by the two experts produced by the Department of Highways were too low. They both used comparables located in Zone C, the same zone in which the subject property is located. Property in Zone C, corner lots, will bring $150.00 per front foot, Mr. Munson stated, as there was a tremendous demand presently for property so classified. This was not contradicted by plaintiff’s experts. It is my opinion that the Hatcher sale should have been used as a comparable by the Department’s experts, since they used other comparables in the same area. Besides, both Mr. Roseman and Mr. Thompson testified that property in that area, without considering the Hatcher sale, was worth $200.00 a front foot. The Hatcher sale met the test of a voluntary sale from a willing seller to a willing purchaser.
“It is my judgment that the value of $133.00 per front foot, plus $500.00 for corner influence, used by defendant’s expert, Mr. Munson, represents the fair market value of the subject property (land only). I also think that his replacement costs of the improvements represent their fair market value. His appraisal, land and improvements, was concurred in by defendant’s other expert, Mr. Moore.
“I was very familiar with the subject property and visited the sites of the com-parables used by all the experts before reaching my conclusions in this case.
“From the evidence and the court’s personal knowledge of the subject property and the comparables used by the experts in this case, it is my judgment that the fair market value of the subject property at the time of its taking was the sum of Twenty-two Thousand and No/100 ($22,000.00) Dollars. Accordingly, judgment is hereby rendered and will be signed in favor of the defendant and against the plaintiff in the sum of Twenty-two Thousand and No/100 ($22,000.00) Dollars, with legal interest thereon from the date that title to the property vested in plaintiff, until paid, less and except the sum of Sixteen Thousand Eight Hundred and No/100 ($16,800.00) Dollars previously deposited by the plaintiff in the registry of the court on August 9, 1957, it being understood that said interest is due on the difference between said sums only.”
There appearing no manifest error, the judgment appealed from is affirmed.
Judgment affirmed.